IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARY M. MITCHELL,

        Plaintiff,

        v.                            Civil Action No. 5:06-CV-13

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

    Plaintiff, Mary Mitchell, (Claimant), filed her Complaint on February 3, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on April

24, 2006.[2]  Claimant filed her Motion for Summary Judgment on September 27, 2006.[3]

Commissioner filed her Motion for Summary Judgment on November 2, 2006.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 16.

[4] Docket No. 17.

2.       <u>Commissioner's Motion for Summary Judgment</u>.

C.      <u>Recommendation</u>

I recommend that:

1.       Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so she may properly consider the combined effects of Claimant's impairments.

2.       Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.


## II. Facts

A.      <u>Procedural History</u>

Claimant filed her application for Social Security Disability Insurance Benefits on August 6, 1997, alleging disability since June 4, 1998. The application was denied and initially and on reconsideration. Claimant requested review by an ALJ and received a hearing before an ALJ on November 11, 1998. On April 26, 1999, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council on June 3, 1999.

While Claimant's request for review was pending before the Appeals Council, Claimant filed a second application on January 13, 2000. The claim was denied initially and on reconsideration. Claimant requested review by an ALJ, which she received. On July 11, 2001, the ALJ ruled against Claimant. The ALJ found Claimant not disabled from the period of April 27, 1999 to July 11, 2001. Claimant requested review by the Appeals Council of this decision on July 30, 2001. Claimant then filed a third application on November 15, 2001, while both her

prior applications were before the Appeals Council.

The Appeals Council denied Claimant's request for review of the first two applications on April 10, 2002. Claimant then filed an action for review in this Court, with the applications designated Mitchell I and Mitchell II. On July 16, 2002, Commissioner granted Claimant's third application for benefits. Claimant was given an onset date of July 12, 2001.

By an order dated July 18, 2003, the Honorable Frederick P. Stamp, Jr., United States District Judge, ordered Mitchell I remanded for further consideration. The Court found the ALJ had failed to properly apply the pain analysis of Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). The Court also ordered the decision of the ALJ be affirmed in Mitchell II. On March 31, 2004, the Appeals Council remanded Mitchell I to the ALJ for further consideration. The Appeals Council instructed the ALJ to limit his decision to the time period at issue in Mitchell I.

Claimant received a new hearing before an ALJ for her Mitchell I application on August 5, 2004. On February 3, 2005, the ALJ again ruled against Claimant. On February 9, 2005, Claimant filed a request for review before the Appeals Council. On April 27, 2005, the Appeals Council granted her a sixty day extension of time to file exceptions to the ALJ's decision. However, Claimant did not file her exceptions until November 30, 2005. On December 9, 2005, the Appeals Council informed Claimant her exceptions were untimely. It gave her sixty days to file an action in this Court. Claimant filed this action on February 3, 2006, which proceeded as set forth above.

B.    Personal History

Claimant was thirty eight years old on the date of the November 11, 1998 hearing before the ALJ and forty three years old on the date of the August 5, 2004 hearing. Claimant has a high

school education. Claimant has prior relevant work experience as a grocery store worker and manager.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: June 4, 1998 – April 26, 1999.[5]

**Robert Gerwin, M.D., 12/21/98, Tr. 171**
Interpretation: pressure pain threshold findings are compatible with clinical findings of myofascial trigger points.

**Robert Gerwin, M.D., 10/27/98, Tr. 172**
Problem: post-traumatic low back pain

**Robert D. Gerwin, M.D., 10/26/98, Tr. 173**
Problem: spine injury and myofascial pain

**Robert D. Gerwin, M.D., 9/28/98, Tr. 175**
Problem: chronic musculoskeletal pain, post-traumatic

**Robert Gerwin, M.D., 8/18/98, Tr. 177**
Problem: post-traumatic myofascial pain

**Robert Gerwin, 8/7/98, Tr. 180**
Problem: widespread myofascial pain, post-trauma

**Robert Gerwin, 8/5/98, Tr. 181**
Problem: post traumatic myofascial pain syndrome

_____

[5] Some of the evidence in the record comes from before Claimant's alleged onset date of disability.  Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).  Other portions of evidence come from after the period of alleged disability ended.  The Court should consider evidence from after the period of alleged disability so long as it could be relevant to the disability determination.  Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987).

**Robert Gerwin, M.D., 8/4/98, Tr. 182**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/29/98, Tr. 183**
Problem: diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 7/27/98, Tr. 184**
Problem: widespread myofascial pain syndrome

**Robert Gerwin, M.D., 7/22/98, Tr. 185**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/20/98, Tr. 186**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/15/98, Tr. 187**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/13/98, Tr. 188**
Problem: widespread myofascial pain syndrome after trauma

**Robert Gerwin, M.D., 7/8/98, Tr. 189**
Problem: myofascial pain syndrome

**Robert Gerwin, M.D., 7/6/98, Tr. 190**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 6/24/98, Tr. 191**
Problem: left chest pain

**Robert Gerwin, M.D., 6/22/98, Tr. 193**
Problem: the barium enema showed a beaklike indentation in the rectum

**Robert Gerwin, M.D., 6/10/98, Tr. 194**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 6/9/98, Tr. 195**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 6/8/98, Tr. 196**
Problem: widespread myofascial pain syndrome following injury that included fracture of the coccyx. The injury occurred on December 30, 1993.

**Robert Gerwin, M.D., 6/3/98, Tr. 197**

Problem: post-traumatic widespread myofascial pain syndrome and fractured coccyx.

**Robert Gerwin, M.D., 6/2/98, Tr. 198**
Problem: post-traumatic widespread myofascial pain syndrome; fracture of coccyx

**Robert Gerwin, M.D., 5/29/98, Tr. 199**
Problem: post-traumatic widespread myofascial pain syndrome; fracture of coccyx.

**Robert Gerwin, M.D., 5/27/98, Tr. 200**
Problem: post-traumatic myofascial pain syndrome with widespread pain
Diagnosis: sacroiliac joint and sacral dysfunction

**Robert Gerwin, M.D., 5/18/98, Tr. 201**
Problem: widespread myofascial pain syndrome

**Robert Gerwin, M.D., 5/14/98, Tr. 202**
Problem: diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 5/12/98, Tr. 203**
Problem: post-traumatic myofascial pain syndrome

**(Unsigned), 4/15/98, Tr. 206**
Problem: injury on December 30, 1993 complicated by widespread myofascial pain

**Robert Gerwin, M.D., 4/13/98, Tr. 207**
Problem: injury on 12/30/93; diffuse myofascial pain

**Robert Gerwin, M.D., 4/10/98, Tr. 208**
Problem: injury, 12/30/93, with diffuse myofascial pain

**Robert Gerwin, M.D., 4/9/98, Tr. 209**
Problem: injury from December 30, 1993, with diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 4/7/98, Tr. 210**
Problem: injury from December 30, 1993, with diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 3/25/98, Tr. 211**
Problem: injury from December 30, 1993, with diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 3/18/98, Tr. 214**
Problem: widespread myofascial pain syndrome, with low back pain, following injury of 12/30/93

**Robert Gerwin, M.D., 3/16/98, Tr. 215**

Problem: widespread myofascial pain syndrome, injury of 12/30/93

**Robert Gerwin, M.D., 3/9/98, Tr. 217**
Problem: myofascial pain syndrome, diffuse

**Robert Gerwin, M.D., 1/9/98, Tr. 218**
Impression: widespread myofascial pain syndrome, including the pelvic and coccyx region, which needs to be further examined.

**Mary Alice Welsh, S.P.T., 9/28/99, Tr. 240**
Assessment: increased pain in bilateral buttocks, lower back, left LE, right piriformis tightness, decreased hip external rotation 10 degrees less than left

**Lawrence Kelly, D.O., 8/9/99, Tr. 243**
Impression: some mild chronic changes are noted in L4 distribution on the thigh and the anterior thigh and L5, S1 distribution of the external hamstring muscle group and gastroc.  There is no evidence of acute neuropathy and radiculopathy

**Physical Residual Functional Capacity Assessment, –/22/00 (precise date illegible), Tr. 244**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations
      Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
      Extreme heat, extreme cold, hazards: avoid concentrated exposure
      Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited

**Charles Kelly, D.O., 6/11/99, Tr. 266**
Impression: normal MRI thoracic spine

**Charles Kelly, D.O., 5/18/99, Tr. 267**
Impression: questionable slight upper thoracic vertebral wedging.  No other significant finding is demonstrated in the thoracic spine.  In the lumbar spine, there is curvature convex to the left.

There are five lumbar vertebrae. No disc space narrowing is noted. No definite spondylolysis or spondylolisthesis is apparent. There is facet degenerative change on the right at L4-5. No other significant finding besides scoliosis is demonstrated.

**Charles Kelly, D.O., 12/10/97, Tr. 268**
Impression: normal CT scan of the pelvis

**Charles Kelly, D.O., 12/1/97, Tr. 269**
Diagnosis: pelvic pain
Impression: there is a mild diffuse bulging annulus at the L5-S1 level with no change from an old CT scan of 2/28/95.

**Physical Residual Functional Capacity Assessment, 6/2/00, Tr. 271**
Exertional limitations
> Occasionally lift and/or carry 20 pounds
> Frequently lift and/or carry 10 pounds
> Stand and/or walk for a total of about 6 hours in an 8 hour work day
> Sit for a total of about 6 hours in an 8 hour work day
> Push and/or pull: unlimited

Postural limitations
> Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Psychiatric Review Technique, 6/5/00, Tr. 279**
Medical disposition: impairment not severe
Organic mental disorders: no evidence

Affective disorders: disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: depression and anxiety

Mental retardation: no evidence

Anxiety related disorders: anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following: anxiety and depression.

Somatoform disorders: no evidence
Personality disorders: no evidence
Substance addiction disorders: absent

8

Restriction of activities of daily living, difficulties in maintaining social functioning: slight
Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a
timely manner: seldom
Episodes of deterioration or decompensation in work or work-like settings which cause the
individual to withdraw from that situation or to experience exacerbation of signs and symptoms:
never

**(Unsigned), 4/25/00, Tr. 289**
Diagnosis: acute duodenal ulcer, cervical disk disease by Hx

**Jeffrey M. Yost, M.D., 2/9/00, Tr. 300**
Impression: the sacroiliac joints show normal and symmetrical appearances bilaterally.

**Carol Greco-Antonelli, M.D., 4/17/00, Tr. 312**
Impression: small hiatal hernia with associated gastroesophageal reflux, small duodenal bulb
ulcer

**Carol Greco-Antonelli, M.D., 4/17/00, Tr. 313**
Impression: small hiatal hernia with associated gastroesophageal reflux, small duodenal bulb
ulcer

**M. Joseph Grennan, Jr., M.D., 3/30/99, Tr. 316**
Impression: (1) lumbar spinal pain with mild to moderate response after two lumbar epidural
steroid injections, (2) lumbar spinal pain, facet syndrome ruled out in the past due to a poor
response to facet nerve blocks, (3) lumbar spinal pain with possible sacroilitis ruled out against
discogenic syndrome, (4) myofascial pain syndrome as an epiphenomenon, (5) radicular
syndrome of the left lower extremity possibly secondary to #2 or #3 versus possible new changes
with discogenic syndrome.

**M. Joseph Grennan, Jr., M.D., 2/26/99, Tr. 319**
Impression: (1) lumbar spinal pain: facet syndrome has been ruled out after poor response to
lumbar facet nerve blocks done in the past, (2) lumbar spinal pain: rule out sacroilitis versus
discogenic syndrome, (3) myofascial pain syndrome as an epiphenomenon, (4) radicular
syndrome of the left lower extremity possibly secondary to #2 or #3.

**Mark LoDico, M.D., 1/26/99, Tr. 322**
Impression: (1) lumbar spinal pain, facet syndrome has been ruled out secondary to no response
to first screening block, (2) lumbar spinal pain, rule out possible sacroilitis, (3) lumbar spinal
pain, rule out possible discogenic syndrome, (4) radicular syndrome of the left lower extremity,
possibly secondary to #2 or #3 above, (5) myofascial pain syndrome as an epiphenoomenon.

**Mark LoDico, M.D., 1/11/99, Tr. 326**
Impression: (1) lumbar spinal pain, with facet ruled out versus sacroiliac joint versus disc
etiology, (2) lumbar spinal radicular syndrome, (3) myofascial pain syndrome as an

epiphenomenon.

**M. Joseph Grennan, Jr., M.D., 12/9/98, Tr. 329**
Impression: (1) lumbar spinal pain with facet syndrome ruled out versus discogenic syndrome, (2) lumbar spinal pain with sacroilitis ruled out, (3) radicular syndrome of the left lower extremity, (4) myofascial pain syndrome as an epiphenomenon.

**Steven Miller, M.D., 7/15/00, Tr. 333**
Impression: finding is compatible with supraspinatus tendonitis or partial tendon tear, tear involving the anterior horn of the glenoid (illegible).

**Charles Kelly, D.O., 12/11/97, Tr. 371**
Impression: normal CT scan of the pelvis

**Charles Kelly, D.O., 12/1/97, Tr. 372**
Diagnosis: pelvic pain
Impression: there is a mild diffuse bulging annulus at the L5 S1 level with no change from an old CT scan of 2/28/95.

**A.L. Antry, D.O., 10/23/98, Tr. 405**
Impression: mild levoscoliosis, the femoral heights appear to be essentially equal with the left heel lift in place, and the sacral base planes remain unchanged with or without the heel lift.

**Dale Pratt-Harrington, D.O., 10/22/98, Tr. 406**
The patient has back pain with mild fascial syndrome, sacral base unleveling, and lumbar rotoscoliosis

**Dale Pratt-Harrington, D.O., 10/6/98, Tr. 407**
Assessment: trigger point right sacroiliac joint, somatic dysfunction of the cervical, thoracic, lumbar regions, and sacrum.

**Dale Pratt-Harrington, D.O., 10/6/98, Tr. 409**
Assessment: trigger point right sacroiliac joint, somatic dysfunction of the cervical, thoracic, lumbar regions, and sacrum.

**Dale Pratt-Harrington, D.O., 9/22/98, Tr. 412**
Assessment: low back pain, somatic dysfunction cervical, thoracic, lumbar, sacral regions, right sacroilitis (chronic), sacral base unleveling.

**Steven Miller, M.D., 7/26/00, Tr. 425**
Impression: the MRI scan is abnormal and shows labrum tear as well as indication of partial (illegible) or tendonitis of supraspinatus muscle and tendon relative to the acromion, i.e., possible chronic impingement syndrome or post traumatic changes.

**Steven Miller, M.D., 7/15/00, Tr. 426**
Impression: finding is compatible with supraspinatus tendonitis or partial tendon tear, tear involving the anterior horn of the glenoid labrum.

**Steven Miller, M.D., 6/7/00, Tr. 428**
Impression: most pain is probably coming from the patient's neck, the patient needs further neurosurgical evaluation since she has no appointment scheduled with Dr. Marquart, the patient has a recommendation made today from me for MRI scan of her left shoulder to rule out internal derangement of her shoulder, the pain pattern is suggestive of a cervical problem with referred pain to her shoulder

**Michael J. Joyce, M.D., 9/14/00, Tr. 431**
Impression: The patient has a number of myofascial complaints.

**John Brems, M.D., 9/18/00, Tr. 436**
Impression: chronic, multi-directional shoulder instability, symptomatic left, asymptomatic right

**Peter B. Sinks, M.D., 10/2/00, Tr. 437**
Impression: post traumatic myofascial mechanical pain syndrome with features of fibromyalgia, mechanical, cervical, and lumbar back pain syndrome

**Paul O. Young, Ph.D, 1/2/01, Tr. 440**
Functional abilities:
        Concentration, social, immediate memory, long term memory, persistence, pace: within normal limits
        Long term memory: markedly deficient

Verbal IQ: 94
Performance IQ: 102
Full scale IQ: 98
Verbal comprehension: 96
Perceptual organization: 107

The IQ scores are considered valid. Her scores place her within the average range of ability.

WRAT-3
Reading: 102 (post-high school)
Spelling: 102 (high school)
Arithmetic: 98 (high school)

The WRAT-3 score is considered valid.
Diagnostic impression:
Axis I: Anxiety disorder due to general medical difficulties, with generalized anxiety
Axis II: no diagnosis

Axis III: Continued neck, back, shoulder, mild facial pain syndrome along with leg pain secondary to injury

Prognosis: guarded

**Medical Assessment of the Ability to do Work-Related Activities (Mental), 1/22/01, Tr. 446**
Making occupational adjustments
        Follow work rules, relate to co-workers, use judgment, interact with supervisors: good
        Deal with the public, deal with work stresses, function independently, maintain attention/concentration: fair

Making performance adjustments
        Understand, remember and carry out complex job instructions: fair
        Understand, remember and carry out detailed, but not complex job instructions: good
        Understand, remember and carry out simple job instructions: good

Making personal-social adjustments
        Maintain personal appearance: good
        Behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability: fair

**(Signature illegible), 4/25/00, Tr. 451**
Diagnosis: acute duodenal ulcer, cervical disk disease by Hx

**(Signature illegible), 1/5/01, Tr. 452**
Diagnosis: chronic SI joint pain, GERD, currently stable, r/o thyroid disease, r/o connective tissue disease

**Jeanne Paul-Allen, FNP, 2/22/01, Tr. 453**
Assessment: otitis media, left, chronic joint pain, GERD

**Jeanne Paul-Allen, FNP, 3/8/01, Tr. 454**
Assessment: otitis media left, resolved, chronic joint pain syndrome with current exacerbation and history thereof, GERD

**(Unsigned), 5/2/01, Tr. 456**
Assessment: chest discomfort, chronic pain, anxiety and depressive syndrome, discomfort is neuropathic and/or psychosomatic and there is a significant element of anxiety and depression that contributes to the discomfort

**Leonard Calabrese, 4/6/01, Tr. 458**
Impression: tiny extraaxial mass in the muscle aspect of the left middle cranial possa compatible with meningioma.

**Leonard Calabrese, 4/6/01, Tr. 459**
Impression: small disc protrusions at C4-5, C5-6 and C6-7 with mild effacement of the thecal sac but no cord compression

**Salim Hayek, M.D., 6/1/01, Tr. 460**
Assessment:
Pre-procedure diagnosis: L4 radiculopathy–left
Lumbar facet arthropathy: tharacic chest wall pain
Post-procedure diagnosis: same

Pre-procedure pain level: 5 on a scale of 0-10
Post procedure pain level: 0 on a scale of 0-10

**Michael Joyce, M.D., 9/14/00, Tr. 465**
Impression: The patient has a number of myofascial complaints.

**Robert (Illegible), M.D., 1/10/02, Tr. 474**
Assessment: fibromyalgia syndrome

**Charles Kelly, D.O., 12/1/97, Tr. 679**
Impression: there is a mild diffuse bulging annulus at the L5-S1 level with no change from an old CT scan of 2/28/95.

**Charles Kelly, D.O., 11/13/97, Tr. 681**
Impression: non-visualization of the left ovary which cannot be assessed.  The right ovary is normal.  There is no free fluid.

**Michael Fortunato, M.D., 3/11/96, Tr. 682**
Impression: L4-S1 annular bulge, essentially unchanged from the CT scan of 2/28/95

**Michael Fortunato, 2/28/95, Tr. 683**
Impression: small central bulging of the disc at the L4-L5 and L5-S1.  Otherwise: negative

**Michael Fortunato, M.D., 3/4/94, Tr. 684**
Impression: central disc herniation at the L5-S1 level

**Michael Fortunato, M.D., (Undated), Tr. 686**
Impression of sacrum and coccyx: the evidence suggests a non-displaced fracture
Impression of lumbar spine: minimal levoscoliosis, otherwise normal

**David Singer, Ed.D., 12/23/94, Tr. 704**
Diagnostic impression:
Axis I: adjustment disorder with depressed mood
Axis II: V71.09

Axis III: back injury
Axis IV: unable to work due to injury, depression, marital problems

**Peter E. Perzanowski, D.C., 2/19/96, Tr. 718**
Diagnosis: lumbar disc syndrome

**Robert Gerwin, M.D., 3/18/98, Tr. 842**
Problem: widespread myofascial pain syndrome, with low back pain, following injury of 12/30/93.

**Robert Gerwin, M.D., 3/16/98, Tr. 843**
Problem: widespread myofascial pain syndrome from injury of 12/30/93

**Charles Kelly, D.O., 12/1/97, Tr. 854**
Diagnosis: pelvic pain
Impression: there is a mild diffuse bulging annulus at the L5-S1 level with no change from an old CT scan of 2/28/95

**Charles Kelly, D.O., 11/13/97, Tr. 857**
Impression: non-visualization of the left ovary which cannot be assessed. Right ovary is normal. There is no free fluid.

**Thomas E. Andrews, Ph.D., 11/11/97, Tr. 858**
Verbal IQ: 98
Performance IQ: 93
Full scale IQ: 96

WRAT-III
Reading: 96 (higher than high school level)
Spelling: 99 (high school level)
Arithmetic: 99 (high school level)

Diagnostic Impressions:
Axis I: Adjustment disorder with mixed mood of anxiety and depression, secondary to physical conditions
Axis II: none
Axis III: multiple medical problems, as reported by claimant

**Charles Paroda, D.O., 11/16/97, Tr. 863**
Impression: chronic pain syndrome/myofascial pain syndrome, by history, chronic intermittent low back pain strain

**Psychiatric Review Technique, 11/18/97, Tr. 868**
Medical disposition: impairment not severe

Organic mental disorders: no evidence
Schizophrenia, paranoid and other psychotic disorders: no evidence

Affective disorders: disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: (illegible) depression

Mental retardation and autism: no evidence

Anxiety related disorders: anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following: (illegible) anxiety

Somatoform disorders: no evidence
Personality disorders: no evidence
Substance addiction disorders: absent

Restrictions of activities of daily living, difficulties in maintaining social functioning: none
Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, episodes of deterioration or decompensation in work or work like settings which cause the individual to withdraw from that situation or to experience exacerbation or signs and symptoms: never

**Physical Residual Functional Capacity Assessment, 11/20/97, Tr. 877**
Exertional limitations
> Occasionally lift and/or carry 20 pounds
> Frequently lift and/or carry 10 pounds
> Stand and/or walk for a total of about 6 hours in an 8 hour work day
> Sit for a total of about 6 hours in an 8 hour work day
> Push and/or pull: unlimited

Postural limitations
> Climbing, balancing, stooping, kneeling, crouching, crawling: occassionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Robert Gerwin, M.D., 1/9/98, Tr. 885**
Impression: widespread myofascial pain syndrome, including the pelvic and coccyx region, which needs to be further examined.

**Physical Residual Functional Capacity Assessment, 3/25/98, Tr. 889**
Exertional limitations
> Occasionally lift and/or carry 20 pounds

Frequently lift and/or carry 10 pounds
Stand and/or walk for a total of about 6 hours in an 8 hour work day
Sit for a total of about 6 hours in an 8 hour work day
Push and/or pull: unlimited

Postural limitations
Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Dale Pratt-Harrington, D.O., 10/6/98, Tr. 918**
Assessment: trigger point right sacroiliac joint, somatic dysfunction of the cervical, thoracic, lumbar regions, and sacrum

**Dale Pratt-Harrington, D.O., 10/6/98, Tr. 920**
Assessment: trigger point right sacroiliac joint, somatic dysfunction of the cervical, thoracic, lumbar regions, and sacrum

**Dale Pratt-Harrington, D.O., 9/22/98, Tr. 922**
Assessment: low back pain, somatic dysfunction cervical, thoracic, lumbar, sacral regions, sacral base unleveling

**Dale Pratt-Harrington, D.O., 9/22/98, Tr. 925**
Assessment: low back pain, somatic dysfunction cervical, thoracic, lumbar, sacral regions, sacral base unleveling

**A.L. Antry, D.O., 10/23/98, Tr. 927**
Impression: mild levoscoliosis, the femoral heights appear to be essentially equal with the left heel lift in place, and the sacral base planes remain unchanged with or without the left heel lift

**Christopher L. Marquart, M.D., 5/26/99, Tr. 928**
Diagnosis: lumbrosacral strain, (illegible)

**Gary Persing, P.T., 4/7/98, Tr. 974**
Assessment: there was notable reduction in the patient's myofascial tightness

**Robert Gerwin, M.D., 10/27/98, Tr. 984**
Problem: post-traumatic low back pain

**Robert Gerwin, M.D., 10/26/98, Tr. 985**
Problem: spine injury and myofascial pain

**Robert Gerwin, M.D., 8/28/98, Tr. 987**
Problem: chronic musculoskeletal pain, post-traumatic

**Robert Gerwin, M.D., 8/18/98, Tr. 988**
Problem: post-traumatic myofascial pain

**Robert Gerwin, M.D., 8/7/98, Tr. 991**
Problem: widespread myofascial pain, post trauma

**Robert Gerwin, M.D., 8/5/98, Tr. 992**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 8/4/98, Tr. 993**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/29/98, Tr. 994**
Problem: diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 7/27/98, Tr. 995**
Problem: widespread myofascial pain syndrome

**Robert Gerwin, M.D., 7/22/98, Tr. 996**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/20/98, Tr. 997**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/15/98, Tr. 998**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 7/13/98, Tr. 999**
Problem: widespread myofascial pain syndrome after trauma

**Robert Gerwin, M.D., 7/8/98, Tr. 1000**
Problem: myofascial pain syndrome

**Robert Gerwin, M.D., 7/6/98, Tr. 1001**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 6/24/98, Tr. 1002**
Problem: left chest pain

**Robert Gerwin, M.D., 6/22/98, Tr. 1004**
Problem: the barium enema showed a beaklike indentation in the rectum

**Robert Gerwin, M.D., 6/10/98, Tr. 1005**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 6/9/98, Tr. 1006**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 6/8/98, Tr. 1007**
Problem: widespread myofascial pain syndrome following injury by which included fracture of the coccyx. The date of the injury was 12/30/93.

**Robert Gerwin, M.D., 6/3/98, Tr. 1008**
Problem: post-traumatic widespread myofascial pain syndrome and fractured coccyx.

**Robert Gerwin, M.D., 6/2/98, Tr. 1009**
Problem: post-traumatic widespread myofascial pain; fracture of coccyx

**Robert Gerwin, M.D., 5/29/98, Tr. 1010**
Problem: post-traumatic widespread myofascial pain syndrome; fracture of coccyx

**Robert Gerwin, M.D., 5/27/98, Tr. 1011**
Problem: post-traumatic myofascial pain syndrome with widespread pain
Diagnosis: sacroiliac joint and sacral dysfunction

**Robert Gerwin, M.D., 5/20/98, Tr. 1012**
Problem: post-traumatic myofascial pain syndrome with widespread pain

**Robert Gerwin, M.D., 5/18/98, Tr. 1013**
Problem: widespread myofascial pain syndrome

**Robert Gerwin, M.D., 5/14/98, Tr. 1014**
Problem: diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 5/12/98, Tr. 1015**
Problem: post-traumatic myofascial pain syndrome

**Robert Gerwin, M.D., 5/15/98, Tr. 1017**
Problem: injury of December 30, 1993, complicated by widespread myofascial pain

**Robert Gerwin, M.D., 4/13/98, Tr. 1019**
Problem: injury of December 30, 1993, with diffuse myofascial pain

**Robert Gerwin, M.D., 4/10/98, Tr. 1020**
Problem: injury of 12/30/93 with diffuse myofascial pain

**Robert Gerwin, M.D., 4/9/98, Tr. 1021**
Problem: injury of December 30, 1993, with diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 4/7/98, Tr. 1022**
Problem: injury of December 30, 1993, with diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 3/25/98, Tr. 1023**
Problem: injury of December 30, 1993, with diffuse myofascial pain syndrome

**Robert Gerwin, M.D., 3/18/98, Tr. 1026**
Problem: widespread myofascial pain syndrome, with low back pain, following injury of 12/30/93

**Robert Gerwin, M.D., 3/16/98, Tr. 1027**
Problem: widespread myofascial pain syndrome; injury of 12/30/93

**Robert Gerwin, M.D., 3/9/98, Tr. 1029**
Problem: myofascial pain syndrome, diffuse

**Robert Gerwin, M.D., 1/9/98, Tr. 1030**
Impression: widespread myofascial pain syndrome, including the pelvic and coccyx region, which needs to be further examined.

**Robert C. Solomon, M.D., 4/13/00, Tr. 1054**
Diagnosis: recurrent sacroiliac pain

**Lawrence Kelly, D.O., 8/9/99, Tr. 1055**
Clinical impression: some mild chronic changes are noted in L4 distribution on the thigh and the anterior thigh and L5, S1 distribution of the external hamstring muscle group and gastroc. There is no evidence of acute neuropathy or radiculopathy.

**Steven Miller, M.D., 7/15/00, Tr. 1060**
Impression: finding is compatible with supraspinatus tendonitis or partial tendon tear, tear involving the anterior horn of the glenoid labrum

**M. Joseph Grennan, Jr., M.D., 3/30/99, Tr. 1065**
Impression: (1) lumbar spinal pain with mild to moderate response after two lumbar epidural steroid injections, (2) lumbar spinal pain (facet syndrome ruled out in the past due to a poor response to facet nerve blocks), (3) lumbar spinal pain (rule out sacroilitis versus discogenic syndrome), (4) myofascial pain syndrome as an epiphenomenon, (5) radicular syndrome of the left lower extremity possibly secondary to #2 or #3 above versus possible new changes with discogenic syndrome.

**M. Joseph Grennan, Jr., M.D., 2/26/99, Tr. 1070**

Impression: (1) lumbar spinal pain (facet syndrome ruled out after poor response to lumbar facet nerve blocks done in past), (2) lumbar spinal pain (rule out sacroilitis versus discogenic syndrome), (3) myofascial pain syndrome as an epiphenomenon, (4) radicular syndrome of the left lower extremity possibly secondary to 2 or 3 above.

**Mark LoDico, M.D., 1/26/99, Tr. 1071**
Impression: (1) lumbar spinal pain (facet syndrome ruled out secondary to no response to first screening block), (2) lumbar spinal pain (rule out sacroilitis), (3) lumbar spinal pain (rule out possible discogenic syndrome), (4) radicular syndrome of the left lower extremity (possibly secondary to #2 or #3 above), (5) myofascial pain syndrome as an epiphenomenon.

**Mark LoDico, M.D., 1/11/99, Tr. 1075**
Impression: lumbar spinal pain (rule out facet versus sacroiliac joint versus disc etiology, lumbar spinal radicular syndrome, myofascial pain syndrome as an epiphenomenon

**M. Joseph Grennan, Jr., M.D., 12/9/98, Tr. 1078**
Impression: lumbar spinal pain (rule out facet syndrome versus discogenic syndrome), lumbar spinal pain (rule out possible sacroilitis), radicular syndrome of the left lower extremity, myofascial pain syndrome as an epiphenomenon

**John J. Brems, M.D., 9/18/00, Tr. 1318**
Impression: chronic, multi-directional shoulder instability; symptomatic left, asymptomatic right

**Michael J. Joyce, M.D., 9/14/00, Tr. 1326**
Impression: the patient has a number of myofascial complaints.

**Leonard Calabrese, 4/6/01, Tr. 1349**
Impression: small disc protrusions at C4-5, C5-6, and C6-7 with mild effacement of the thecal sac but no cord compression

**Leonard Calabrese, 4/6/01, Tr. 1350**
Impression: tiny extraaxial mass in the mesial aspect of the left middle cranial fossa, compatible with a meningioma

**Lawrence Kelly, D.O., 8/9/99, Tr. 1354**
Impression: some mild chronic changes are noted in L4 distribution on the thigh and the anterior thigh and L5, S1 distribution of the external hamstring muscle group and gastroc. There is no evidence of acute neuropathy or radiculopathy.

**Carol Greco-Antontelli, M.D., 4/17/00, Tr. 1355**
Impression: small hiatal hernia with associated gastroesophageal reflux, small duodenal bulb ulcer

**Steven Miller, M.D., 7/15/00, Tr. 1356**

Impression: finding is compatible with supraspinatus tendonitis or partial tendon tear, tear involving the anterior horn of the glenoid labrum

**William Noble, M.D., 11/3/00, Tr. 1357**
Impression: increased activity of all the joints with the pattern tending to favor a metabolic disease such a hyperparathyroidism over that of an arthritis, but clinical correlation is needed

**Max L. West, M.D., 12/30/93, Tr. 1359**
Impression: fracture fo the lower segment of the sacrum

**Michael Fortunato, 12/30/93, Tr. 1368**
Impression of sacrum and coccyx: buckling deformity of the anterior distal portion of the sacrum suggesting non-displaced fracture

Impression of lumbar spine: minimal levoscoliosis, otherwise normal

**Gary Loh, M.D., 5/1/01, Tr. 1403**
Impression: no acute infiltrates of change since 3/3/99.

**Mark Benson, M.D., 6/11/01, Tr. 1412**
There is mild scoliosis in the thoracic spine.  The thoracic vertebrae are of normal height and alignment.  There is subtle early degenerative change with subtle end plate spurring.

**Charles Kelly, D.O., 5/28/99, Tr. 1414**
Impression: probable disc protrusion C5-6 with caudal extension of disc fragments

**Charles Kelly, D.O., 5/28/99, Tr. 1415**
Diagnosis: severe left shoulder pain

Impression of thoracic spine: questionable slight upper thoracic vertebral wedging.  No other significant findings demonstrated.

Impression of lumbar spine: facet degenerative changes at L4-5 on the right.  No other significant finding is demonstrated other than scoliosis.

**Cheryl P. Entress, M.D., 7/6/01, Tr. 1474**
Impression: panic attacks, history of headaches, meningioma, history of H-pylori, history of herniated disc at L5-L5 level, fibromyalgia syndrome, chronic back pain syndrome, several dark nevi back and abdomen.

**Jeanne Paul-Allen, 3/8/01, Tr. 1483**
Assessment: chronic joint pain syndrome with current exacerbation and history thereof; GERD

**Jeanne Paul-Allen, 2/22/01, Tr. 1485**

Assessment: chronic joint pain, GERD

**(Signature illegible), 1/5/01, Tr. 1486**
Diagnosis: chronic SI joint pain, GERD, currently stable, r/o thyroid disease, r/o connective tissue disease

**(Signature illegible), 4/25/00, Tr. 1487**
Diagnosis: acute duodenal ulcer, cervical disk disease by Hx

D.      Testimonial Evidence

Testimony was taken at the November 5, 1998 hearing.  The following portions of the testimony are relevant to the disposition of the case.

*               *               *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q      What were your duties as manager of the store?

A      Well, everything changed after I had the accident.  Do you want my duties, like - -

Q      Prior to the time of your accident.

A      - - prior to the accident?  Store manager, I was entitled of all operations of the store, which were employees, hiring, scheduling.  I had an assistant manager that worked with me, so, of course, she helped me in all of this.  Ordering, merchandising.

Q      Basically in charge of running the entire store and - -

A      Yes.

Q      - - everything that's involved with that.

A      Yes.

Q      Now, you mentioned that these duties changed after your accident.  Now, you're referring, of course, to the accident you had in December of 1993?

A      Yes.

Q       How did your duties change following that?

A       Well, everything fell on Carolyn, my assistant manager, mainly.  And even though I still carry the title as manager, she was, you know, doing my workload.

Q       Why was this?

A       Because I wasn't able to do it and I wasn't spending much time there and, you know, so she was doing it.

*                    *                    *

Q       You said that, you know, when these tremors increase you have the manipulations, that you end up spending a significant amount of time in bed.

A       Um-hum.

Q       Now, what do you mean by that?

A       Okay.  Well, what else brings on those tremors is, like, if I push a buggy - - these are things that I've recalled.  Like, if I twist side to side or if I pull, it - - and they're thinking that the facets, they trap the nerve and then that starts the tremors and then - -

Q       What - - do the tremors subside - -

A       Yes.

Q       - - by themselves after a period of time?

A       Yes.  If I lay, rest and do all that and do nothing, absolutely nothing, I can get myself out of there, until the next time.

Q       What kind of length of time are we talking about?

A       Back in the old reports, you're going to read it as my back going out.  That's what I used to tell doctors.  But since 5 years from now, I've come to understand it more now.  I mean,

I walked around 4 years and really misdiagnosed or 3 years. Until someone started really finding out what's wrong with me.

Q      So once again, when you have these tremors, when you're bedridden for a period of time - -

A      Um-hum.

Q      - - how long a period of time will you have to be down before you're - - before that subsides and you're able to be a little more functional again?

A      Well, I can be in bed for 3 days and gradually getting out or - - I've seen myself in bed for weeks, most of the day. You get out and do the bare things, you know, and crawl back in bed and then they might go away for a while. Until the next - -

Q      So it's hard to - -

BY ADMINISTRATIVE LAW JUDGE:

Q      And why is it necessary to remain in bed during these periods? Is it due to exhaustion or pain or what's the - -

A      Okay. Yeah. Okay. What happens is, when I get - - when the tremors start, okay. I get the sweats, my heart rate starts - - my heart rate gets faster because I did this in the doctor's office and it will be in his reports. And my blood pressure drops. And he says it's created - - and then I get totally fatigued. I'm, like, sitting there exhausted. And I don't know what - - about the nervous system, like I said to him, I don't know what that actually means, but it - - something with your central nervous system. I don't - - it just happens like that. And it's - -

Q      So it's a matter of not having any energy? Is that - - fatigue? Is that - -

A       No.  And the pain is so severe.  Oh, the pain.  And you're - - my back is so severe.
And it just makes everything hurt.  And then sometimes I'll be in bed just from muscular aching
all over.

*               *               *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q       Again, what's a typical day consist of for you?

A       I get up in the morning at 6:30 a.m. and I pack my son's lunch and he usually
makes his own breakfast.  He's 15.  And then I wake the other two - - the younger - - the middle
one up to get in the bathroom at 6:30.  And I kind of sit around, waiting on them.  And then I
wake the little one up at 7:15, of course, and then I get them off to school.  And then I'll sit back
and think about things and kind of lounge, maybe a half hour or so and kind of plan my day.
You've got to - - with chronic pain, it's - - I don't know.  What is it?  It's, like, if you have a
good day, you can get some things done.  And then if you can't get them done, you've got to
learn not to be so frustrated, discouraged about it and pick them up tomorrow.  So you're always
kind of, like, regrouping.  And, like, what you thought you were going to do today - - or you did
a little bit extra today because you don't know what tomorrow is going to be.  That's kind of like
what the books teach you, to try to do it that way.  And so then I - - I think about what I'm going
to get them to eat at supper.  And I do that everyday.  And I make them a meal.

Q       So do you try to prepare the evening meal?

A       Yes, I do.  I start about 10:00, 12:00 and kind of work with it a little bit all day.

Q       Okay.  Do you - - so you don't go into the kitchen at one time and prepare the
entire meal?

A       No.  I don't prepare a meal everyday.  It's all based on how I feel.  We might eat boxed pizza for a week.  Or I might be able to cook a meal 3 or 4 days.  It's - -

Q       What I'm asking, though, is when you do have a day where you prepare the meal, are you able to go into the kitchen and say, for an hour or so, work on preparing the meal or do you have to go about that in a different fashion?

A       Yeah.  I don't think - - I don't spend an hour on it in there.  I mean, I do - - I'll peel potatoes, put them in cold water.  And then I'll, you know, put the meat in the oven and let it - - a couple hours.  I don't do anything grand.  And then I'll open the green beans or whatever, you know, right before it's time to eat, so - -

Q       Do you do the other household chores around the house?

A       I wash the clothes.  The kids bring them down to the basement and sort them.  And then I wash them and they take them back up.  And I do that - -

Q       And why is that?

A       Because I can't lift anything.  I was told not to lift anything over 5 pounds a long time ago.  And I just - -I've lifted - - through the years, what I've done is I've - - I've done all these things.  And I, you know, I try to go back to normal activity.  And so you try - - you learn from your mistakes and you try and fail or you pay for it.  Like, I'll have done something in those years - - this is now 5 years down the road.  I'll have done something I'll know, you know, I can't do this.   So - - and then you know, I do the clothes, which I don't have to be in any hurry about it.  Because I don't really go anywhere.  I've got all day.  And I do the dishes.  And you know, I've got to watch how I do that dishwasher thing, I've learned, because that's a side bending.  So I've got to try to - - it's just teaching myself, I guess, how to - -

Q     Do you try to perform these activities in short periods of time?

A     Yes.  I break it up through the day.

Q     And if you try to perform an activity, say, working at something solidly for an hour or two, what would be the result of that?

A     Then I'll just end up more miserable.

Q     That would increase the pain if you - -

A     Yes.

Q     - - tried to do something continuously that way?

A     Um-hum.  Um-hum.

Q     Do you have any problems with repetitive movements?

A     Yes.

Q     That sort of thing?

A     That's what - - that's this muscle.  You can't do repetitive movement.  You can't, you know, sit too long, stand too long, you can't do the same thing, like, even stirring brownies 2 minutes.  I mean, just doing that, you know, you're starting to feel it back there.  So - -

Q     All right.  Do you do the vacuuming - -

A     No.

Q     - - the sweeping - -

A     I do not.

Q     - - the mopping?  Yard work?

A     No.  I - -

Q     None of those activities?

A      No. I - - again, you know, I tried to do some of that stuff through the years and paid mightily for it. And, you know, ended up in bed more and, you know, cheated the kids out of - -

BY ADMINISTRATIVE LAW JUDGE:

Q      Who does the vacuuming and dusting and that type of - - you know, normal household maintenance?

A      I have someone that come in and cleaned my whole house here recently.

Q      Um-hum.

A      And I used to have - - once a week a lady come in and cleaned it for me. And but now, since the money is shorter, the kids are doing a lot more. I mean, it's unbelievable what the children are doing now.

Q      Outside work, is there outside work to do? Grass?

A      Yeah. My son does most of the outside. He does - - cuts the grass. My daughter does the weed-eating and my - - the little one pulls the weeds. And I was telling him, I tried to sweep with a broom. I mean, you know, you want to always be doing something. If you knew my personality, I was a doer. And, you know, I loved to work. You know, I mean, I've got a Type A personality. I don't know if you noticed. But I even - - if I sweep with a broom, I'm, like, it's an unbelievable thing. I mean, this is - - I can't even believe it at times. So I go out there. Sometimes I attempt the broom, sometimes I know, you know, sit and watch them. I have to direct them, mainly, in a lot of things. So they do it.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q      Do you rest at all during the day?

A       Yes.  What I do is, like, I'll do the dishwasher and clean up the dishes.  And I'll, like, sit - - lay down for maybe a half hour.  And get up and do a little bit more and kind of just, like, poke around and then - - I kept - - I usually lay down at about 1:00 to 3:15 when the kids get home.  And I was told to do that.  I was taught to do that.  Because I wasn't having any energy and I was going to bed, like, 4:30, 5:00 everyday.  And - - because I was miserable.  And so they said, why don't you try to rest through the day so that you have your energy when the kids are home.  So that's what I've been doing.  And then usually after supper, I'll slide to the couch for maybe an hour when they do the homework.  I'm in the room with them, but - -

                    *                    *                    *

A       Um-hum.  Oh, after the accident, I'm like, two different people.  Before the accident, before I had - - I had a sled riding accident.  Before I had it, I was the most energetic person that, you know, you ever met.  You know, I was always on the go.  Anything the kids did, I did.  If they roller skated, I roller skated.  If they ice skated, I ice skated.  If they rode bikes, I rode bikes with them.  Went walks with them, took them to the playground, everything.  You know, ran all day, visited people, shopped.  And  then - - I don't know, then when you live in chronic pain, then you go to this - - this new life, it's so slow.  And it's - - everything changes. you lose everything.  Everything - - like, socially - - if I see my parents once a month - - I even feel bad.  Because I don't go down there more.  And recreational activity, you know, I don't do anything more.  Now, I'm trying to want to, you know, pick that up and they want to get me in the pool and walk to build and then, you know, learn to run in the pool.  They want me to start doing things in water to build muscle strength.  It's - my social life.  I used to have friends and family to do everything with.  I don't know.  When you're in chronic pain, I don't know, I guess

you - - you don't feel like doing anything, for one.  And you somewhat isolate, is what you do.

Q       Do you spend the majority of your day at home?

A       Yes.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q       Very well.  Then would you describe for us the Claimant's past relevant work in terms of skill and exertional level?

A       Thank you, Your Honor.  I reference Ms. Mitchell's testimony this afternoon and the disability report marked up in this file as Exhibit 1E.  I believe the period 12/81 through 6/4/97,  she was engaged full-time and as a retail grocery store manager.  DOT classifies this as a light exertional level job and skilled with an SVP of seven.  And precedent to that, she was a clerk in the grocery store and cashier.  Light exertional demands, unskilled.  That is her entire work history as I know and understand it, Your Honor.

Q       Does the assistant manager come sort of within the manager ambit or - -

A       Yes, it does.

Q       Okay.

A       They're both light.

Q       Right.

A       The assistant would be semi-skilled.

Q       Um-hum.

A       And then once you get to manager, you're in skilled.

Q       Would there be any transferable skills to a sedentary level job?

A There would be sedentary - - yes, Your Honor.

Q And why type of skills?

A An exact in retail.

Q In retail?

A In retail.

*   *   *

After the hearing, the ALJ propounded written interrogatories to the Vocational Expert.

The following are his questions:

1. Identify the skills which Claimant acquired as a Retail Grocery Manager which are transferable to sedentary work.  See reverse side.

2. Assume an individual of the Claimant's age, educational background and work history.  Assume that such person: can perform sedentary lifting; can sit for up to 30 minutes at a time; stand for up to one hour at a time; can walk for up to 30 minutes at a time; requires a sit/stand option; can climb one flight of stairs; can occasionally bend; should never kneel, crawl, crouch or squat; should work in a low stress environment; should have only occasional contact with others.  Are there any jobs in the regional or national economy which such a person could perform?

3. Add to No. 2 that such has the transferable skills identified in your answer to No. 1.  Are there any jobs in the regional or national economy which such person could perform utilizing some or all of the transferable skills?  If so, please identify the jobs, stating which skills would be used

31

in which job.

See reverse side.

*               *               *

The Vocational Expert responded in writing as follows:

1.      See enclosed copy of page 135, Volume 1, Dictionary of Occupational Titles.

2.      Yes.  Illustrative, not meant to be exhaustive and/or all inclusive examples of such work are as follows:

Security Guard, Unarmed, at a TV monitor - GUARD, SECURITY, 372.667.034, L, GED:  R3, M1, L2, SVP: 3, DLU: 88, Volume I, Page 269

GATE GUARD: 372.667-030, L, GED: R3, M2, L2, SVP: 3, DLU 80, Volume I, Page  268

SORTER: 209.687-022, S, GED: R2, M1, L2, SVP: 3, DLU: 77, Volume I, Page 181

TELEPHONE SOLICITOR: 299.357-014, S, GED: R3, M3, L3, SVP: 3, DLU: 88, Volume I, Page 236

ASSEMBLER: 734.687-014, S, GED: R2, M1, L1, SVP: 2, DLU: 77, Volume II, Page 757

BANDER, HAND: 920.687-030, S, GED: R2, M1, L1, SVP: 2, DLU: 77, Volume II, Page 936

3.      No.   His skills are industry-specific, and do not transfer to sedentary exertional level lifting with a sit stand option.

\*       \*       \*

Testimony was taken at the December 11, 2000 hearing.  The following portions of testimony are relevant to this case:

\*       \*       \*

[EXAMINATION OF CLAIMANT BY ALJ]

Q      Now, how much can you lift?

A      Five pounds.

Q      Why is that?  What happens if you go over that?

A      My shoulder and back pain increases.

Q      How far can you walk at a stretch before you have to stop and sit down or - -

A      One block.

Q      And then how long do you have to sit before you can get up and move again?

A      Five minutes.

Q      And any problems with standing?

A      Yes.

Q      How long can you stand?

A      Fifteen minutes.

Q      And then how long do you have to sit before you can get up and stand again?

A      Five minutes.

Q      Any problems with your hands or fingers?

A      Yes.

Q      What?

A      They go numb with writing, hold.

Q      How long does it take before, you know, writing before they end up going numb?

A      Maybe fifteen, twenty minutes.

Q      Can you use a knife and a fork?

A      Yes.

Q      Can you hold a cup of coffee or glass of milk okay?

A      Yes.

Q      And do you have any problems with sitting?

A      For a long time, yes.

Q      About how long can you go before you have to move?

A      Half an hour.

Q      And then what happens?

A      I need to get up and walk around, I get stiff.

Q      And how long do you have to be up before you're able to sit back down again?

A      Five minutes.

Q      How do you spend time most days, from the time you get up in the morning, what do you do most of the days?

A      I get up and get the kids off to school and I'll wash dishes, pace myself throughout the day and making supper, watching television, reading, read the newspaper.

Q      Do you make breakfast?

A      No.

Q      Do the kids, I take it they dress themselves?

A       Yes.

Q       When you say get them off to school, what do you mean?

A       Make sure that they're up and pack their lunch.  Give them a bowl of cereal.

Q       What kind of things do you read, you know, you mentioned the newspaper,

anything else?

A       Spirituality books.

Q       Do you pretty much understand everything?

A       That I read, with what I read?  Yes.

Q       Okay, how about on TV?  Pretty much understand everything you watch on TV?

A       No.

Q       What kinds of things do you have problem with ?

A       On TV?

Q       Yes.

A       I don't understand sports.

Q       Do you ever get out and visit friends or relatives?

A       Once in a while.

Q       Do people come over and visit you?

A       No.

Q       Is that a change?

A       Yes.

Q       Why is that?

A       Why is that?  Because I don't feel like going anywhere anymore, so I only, I see

my parents every couple months and they used to come to my house, but since they're both, they've had their own health problems, so they don't come and visit us anymore. My friends, they don't come around anymore because in the past, throughout the seven year period, they would ask me to do things and I didn't feel good and of course I would decline, and after a while they just don't call anymore.

Q        Do you have any hobbies or anything you can still enjoy doing?

A        No.

Q        Do you ever get out to go to church, or a movie, or a restaurant or anything like that?

A        Get to a restaurant maybe every couple months, maybe about five times a year.

Q        Do you go to the movie, or church?

A        Church maybe once every couple months.

Q        So about the same.

A        And movie, maybe twice a year.

Q        And, you indicated you cook supper slowly?

A        I pace myself, yes.

Q        What kinds of things do you make?

A        Chicken patties, spaghetti, roast, chili.

Q        Do you do any cleaning?

A        House cleaning, no, I have a housekeeper.

Q        How about laundry?

A        Yes, I do laundry.

Q       Do you get out to go grocery shopping?

A       Yes.

Q       How often do you do that?

A       As needed.  As necessary I should say.

Q       And how often is it like once a month, or every week?

A       About every other week.  I go, I take someone with me to push the buggy and carry the bags.

Q       Do you drive?

A       Yes.

Q       Any problems with that?

A       Meaning?

Q       Do you have any problems with driving?

A       In general, no.

Q       Have you worked anywhere since 1997?

A       No.

Q       Have you looked for work since then?

A       No.

                        *            *            *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q       You were asked questions about sitting, I believe you testified that you could sit about a half an hour?

A       Uh-huh.

Q	After half an hour, you say you get up for about five minutes?

A	Uh-huh.

Q	Is that really -

A	Right now I'm jostling in my seat.

Q	Okay.  If you were sitting on and off during an eight-hour workday.

A	Uh-huh.

Q	How long could you sit during that eight-hour workday?

A	Two hours.

Q	Two hours during an eight-hour day.

A	Yes.

Q	Okay.   The same question with regard to standing.  I'm not asking you at one particular instance, I'm saying throughout an entire workday.  How long could you stand?

A	Two hours.

Q	Okay.  If you had the option of alternating sitting and standing, throughout an eight-hour workday, how long do you think you could do both activities together?

A	Four hours.

Q	Okay.  You were asked - -

A	Except when I'm in severe pain, then I've got to lie down.

Q	Okay.  How often are you severe pain?

A	About every ten days.

Q	And how long - -

A	I mean, that's about now how the frequency is coming on.

Q       Okay.  When you're saying severe pain, can you give me an idea from a scale from 0 to 10, 0 being no pain, 10 being unbearable pain?  What is it when you say severe?

A       10.

Q       And you say it happens every ten days?

A       About ten days to two weeks, yes.

Q       What is the duration, when you have that severe pain?

A       Three to five days.

Q       Okay.  So it lasts straight through?

A       Yes.

Q       You were asked a question about how much you can lift and I think you said five pounds, is that correct?

A       Yes.

Q       If you had to lift an amount of weight, say two hours during an eight-hour day, how much do you think you could lift?  I'm talking about repetitive action for at least two hours spread throughout an eight-hour day.

A       Five pounds max, with my shoulder.

Q       Okay.  Does repetitive use or carrying or lifting, does that cause you any problems?

A       Yes.  Repetitive motion is not good.

Q       Okay.  When you say not good, can you be more descriptive?  What kind of problems do you have?

A       Pain.

Q       Okay.  The location is in your shoulder?

A       Neck.   Shoulder, neck.

Q       Of all your pain, where is it the most severe?

A       Shoulder, neck and low back.

Q       Okay.   Not one place in particular.  It's just the whole region?  You can't pinpoint and say, it's right here.  Do you understand my question?

A       Uh-huh.  Yeah, my back.  I'd have to say more left low side with left leg is severe.  So left side leg severe.  And left shoulder, left neck also.  It's all left.

                        *                  *                  *

Q       Okay.  The things you do around the house.  Do you cook every day?

A       No.

Q       Okay.  How often do you cook during the week?

A       I guess I cook something.  I mean, I'll open soup and peaches, if you want to call that cooking, because I'd rather stay home than go out.

Q       Okay.

A       So I, we do eat at home, order pizza.

Q       Give me a general idea.  About how long does it take you to cook a meal?

A       How long does it take me to cook a meal from start to finish?

Q       Correct.

A       I can cook a meal from five minutes, in five minutes to half an hour.

Q       Okay.  Washing dishes, do you have a dishwasher?

A       Yes, I use a dishwasher.

Q       So, do you ever wash any dishes by hand?

A       No.

Q       Do you have anybody help you with the dishes?

A       Yes.

Q       Okay.  Who helps you with the dishes?

A       My daughter.  Helps me with everything.

Q       Okay.  The laundry.

A       Do you do laundry every day?

Q       Yes.

A       Do you have any help with laundry?

Q       Yes.

A       What kind of help do you have with the laundry?

Q       My daughter carries the baskets down, sorts the laundry, carries them up, puts it

away.

A       That's all right, go ahead.

Q       You mentioned grocery shopping.  You say you do that every other week.

A       Yes, that's about right.

Q       Does anybody help you with the grocery shopping?

A       Yes.

Q       Who would that be?

A       My husband or one of my children.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      Mr. Czuczuman, could you please assess the claimant's job as a grocery store manager by job title, exertional level, skill level, and any transferability of skills and as it's generally performed in the national economy?

A      Yes, Your Honor.  Grocery store manager is considered SVP 7, so it's a skilled position and the exertional level is considered light.

Q      Would there be any transferable skills to sedentary work?

A      Yes, Your Honor.  Working as a manager of distribution warehouse, which is sedentary, is SVP 6, and also working as a scheduler/planner.   That's sedentary, semi-skilled, SVP 4.

Q      What skills would have been obtained that would transfer to these two jobs?

A      Okay.  The work as distribution warehouse manager, schedule skills, working with paper, analytical skills, being aware of how much product is necessary to fill a customer's order; ordering products.

Q      The scheduler/planner, what skills would transfer?

A      Also analytical skills, because you would determine the amount of workers you need, you're scheduling them for the different departments along with times that you need them for the different departments along with times that you need them.  So it's analytical also, you're looking at the amount of people necessary in order to fulfill the job required throughout the day.

Q      Let me give you a hypothetical question.  If we assumed a person of the same age and education and working experience as the claimant but assume the hypothetical person needs an ability to sit or stand, to change positions briefly every half hour, and by briefly I mean a

minute or two, would that permit either of these jobs to which the skills were transferred?

A    Yes, it would, Your Honor.

Q    Okay.  If such a person were able to do light work with the same limitations, would there be any unskilled job such a person could do?

A    Yes, Your Honor.  Working as an assembler for electrical accessories, you're looking at light, unskilled, 200,000 national and regional you're looking at 3,000.  Light, unskilled garment folder, 80,000 national, 1,800 regional.

Q    Would there be any unskilled sedentary work that would fit that?

A    Spotter, unskilled, sedentary work 55,000 national, 500 regional.

Q    What is a spotter?

A    Okay.   You're working at a table looking at linoleum squares and you're looking for any defects.

Q    Go ahead.

A    Type copy examiner.  Sedentary, unskilled.  90,000 national, 850 regional.

Q    90,000 and 850 is that what - -

A    Yes, 90,000; 850.

Q    Okay, and what's a type copy examiner?

A    Okay, the person will use copies that come out of the printed press for invitations, and determines whether or not they're coming out clear.  Document preparer, sedentary, unskilled, 60,000 national, 800 regional.

Q    Okay, now, would a person be able to do any of these jobs if they had a problem with concentration so that the concentration were limited and there could be no close

concentration or attention to detail for any extended period of time, would that affect any of these jobs?

A    I would say it would affect the spotter, Your Honor.  Because they're looking at stress, to see if there's even a crack in some of those.  Otherwise I don't see a problem with any of those.

Q    How about the distribution warehouse manager or the scheduler/planner, would that affect those jobs?

A    It would affect the distribution manager warehouse because you'd also be doing duties related to customer orders, and dealing with a lot of different inventories so there is concentration involved.  Scheduler/planner I would say it would also affect that, Your Honor.

Q    Okay.  And I assume if the person could only work four hours a day there would be no jobs they could do?

A    There would be no full-time work they could do, yes, Your Honor.

Q    Go ahead, Mr. Bowman.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY

Q    Generally speaking, when we are talking about jobs, how many unscheduled breaks in an eight-hour day is permissible?

ALJ    Unscheduled?

BY ATTORNEY:

Q    Unscheduled breaks.

A    Well, the person would take breaks for every hour less than 15 minutes that would be permissible.  Once they start taking breaks that amount to 15 minutes or greater for every

hour that they're away from their jobs at unpredictable times, then it would be unacceptable.

ALJ    I'm having a little trouble understanding, I'm sorry.  Could you say that again?

VE    Yes, if the person would take a break for fifteen minutes or greater - -

ALJ    Every hour -

VE    Every hour worked, unscheduled time.  One time is the first part of it, the first ten minutes, next time they leave, at the end of the hour, if they would do that, then they would not be able to - -

ALJ    Okay, I'm afraid that's even worse.  Do you mean that a person can be taking a break fifteen minutes every hour?

VE    Less than fifteen minutes.

ALJ    Fourteen minutes every hour.

VE    Right, exactly.

ALJ    Okay, go ahead Mr. Bowman.

BY ATTORNEY:

Q    I just, to follow up on that, so a person could, theoretically only work three quarters of a day - -

A    Well, the rules is - -

Q    - - and go to lunch too?

A    - - for every hour that they are working, if they are able to be productive for forty-five minutes for that hour, that's considered acceptable.  If there were not be able to do anything, as long as they meet that forty-five minutes, if it's less than forty-five minute for every hour worked, that they're productive, they are not acceptable to an employer, because it's intolerable.

Q        But the question was unscheduled breaks during the eight-hour day.

A        Unscheduled breaks?

Q        It seems to me that you're equating that a fact that a person is not on a break with their being productive.

A        Okay, if they're taking unscheduled breaks and they are productive okay, during their time, they could go ahead and do that.  Because it's not uncommon for somebody to go take a cigarette break, for even 10 minutes, by the time they do their work, and that could be done in an hourly basis, as long as they're there for forty-five minutes out of the hour total.  Now, if it's accommodation.  If you're trying to say accommodation that they are taking unscheduled breaks.  In addition to that, while they are there, they're not able to be productive, then that would be a different story.

Q        I guess, my main, my only question was, if the person was taking hourly unscheduled breaks for fifteen minutes every time -

A        They wouldn't be able to work.

Q        Okay.  The jobs that you mentioned, do any of them involve overhead reaching?

A        Spotter would not, the type copy examiner would not, the document preparer would not.  The manager distribution warehouse would not.  No, I don't see any that would involve overhead reaching, no.

Q        Do any of the seven positions require stooping or crouching?

A        The sedentary positions that I mentioned would not require that.  The position as a manager distribution warehouse would not, because it's a sedentary desk position.

Q        You're saying no stooping or crouching, you mean none.  I'm not talking about

occasional, I'm talking about none.

A No, they would be siting at their desk, they can stand if they want. It's basically paperwork for that position. With the document preparer it's the same thing. You work at a table. In addition, the spotter is also working at a table. Now the position, light category - Okay, the electrical assembler accessories that's also working at a table, it's bench work. [INAUDIBLE] Is also bench work. Now did I mention at all walker room attendant.

Q I don't think so, I have seven listed total. One other question, about how many unscheduled absences on a monthly basis is a person allowed to take before it becomes unpermissible?

A I would say two at the type of positions I mentioned.

Testimony was taken at the August 5, 2004 hearing. The following portions of testimony are relevant to the case:

*   *   *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q And what kind of activities would increase your pain level? You say do anything. Can you be more specific?

A Yeah, like try to fill the dishwasher or sort the clothes or something.

Q Okay. How often would you do those kind of activities?

A Try to sort the dishwasher?

Q Sort the clothes, load the dishwasher, that kind of stuff.

A Depending on my day because when you're in this situation, some days you don't do anything for two days and then some day you'll, you know, do things for you know, you

might feel a little bit okay to get up for a couple hours and do a couple things. So, it varies.

Q      When you say you don't do anything for a couple days, what do you mean? How would you spend your day if you weren't not doing anything?

A      Watch TV. It got to the point where I couldn't even read books because my neck is so bad. So, I started buying video - - books on cassette to listen to.

Q      How frequently in a given month would you have days like that where you weren't doing anything as you testified?

A      How many days like that?

Q      Typical, yeah.

A      Well, I could say three to four days - - three days a week. But, then if they give you an epidural steroid injection or something, then that would put me out and then I would end up in the emergency room. So, then see that could be a five to ten-day affair if they did a procedure on me.

Q      Did you ever experience any improvement during the time frame of June 4, '97 to April 26, 1999?

A      No, just continued to get worse.

Q      Do you think you were capable of working at any point during that time frame?

A      No.

Q      And why is that?

A      Why couldn't I work?

Q      Yeah. Let's say why couldn't you do a job of a secretary?

A      Job of a secretary, well, number one, you have to go like this. When I tried in

'86, you have to use your neck to look down - -

Q        Um-hum.

A        - - which I can't do.

Q        Can't move your neck?

A        And I can't sit all day because of all the whatever - - I don't know whatever - - however it left me, you know, from breaking my sacrum.

Q        Um-hum.

A        And then secretary, I don't know how much I could concentrate on that either.

Q        Why couldn't you concentrate?

A        Because when you're in pain, it's funny.  Even with all this pain in my body, the most severe of the pain is what you concentrate on.  You know, if like you have four pains in your body -

Q        Um-hum.

A        - - but the one that is the most severe that's the one your mind seems to go to is that one.

*               *               *

Q        Okay.  How about the job of the individual when we walked into the building, the guy who was sitting there, could you've done that job during this time frame?

A        No.

Q        Why is that?

A        Because I couldn't sit there long enough probably to check the people in.  And then that's a real important job where you got to make sure that no one comes into the building,

right, for guns and all that type of thing?  So, you got to really be on top of things.

Q    What if - - from as far as sitting, what if you were allowed to get up and you know, stay by your work station, but you could get up and not have to sit necessarily the entire day?

A    Um-hum.

Q    Could you do it if you were allowed that?  You had to stay at your work station.

A    No, because I have to have a bed.

Q    Why is that?

A    Well, that's what I did in '96.  I put a couch with a bed in the office, so that I could lay down in between.

Q    How often would you lay down during like say an eight-hour time frame?

A    I have to lay down when I was at work at least an hour or two.  So, I did put a couch with a bed, you know, that I could lay down on in there and see if I could do it.

Q    Can you give me an understanding of what a typical day like was - - day like - - a day in your life was like during this time frame?  I know you mentioned you were in D.C. for awhile, and you've talked about that a little bit.

A    Um-hum.

Q    But, I'm talking about when you were not out with Dr. Gerwin, may be prior to - - maybe '97 and maybe even in '99.

A    A typical day would be - - it's terrible.  I have to get up - - I would get up with the kids.  Let's see, '97.  Holler from the bed, make sure they're up and getting dressed, and take them to school in my pajamas, which they were so embarrassed, but I had a coat over me.  And

then come home and go back to bed and then get up and then try to get something done

throughout the day.

Q       How long when you came back home would you go back to bed for?

A       It just depends on what day it was and how I felt.

Q       Can you give me a range, a time frame?

A       8:00 maybe until 11:00.

Q       Three hours?

A       Yeah, maybe, um-hum.

Q       And then you would get up, what would you do?

A       Try to do the dishwasher or try to think of something for them to eat.

Q       Who's them?

A       The children.

Q       Weren't they at school?

A       Yes.

Q       Okay.  Would you make dinner?

A       Once in awhile.

Q       In a typical week, how often do you think you'd  make dinner?

A       I don't know, maybe two days a week, maybe three days a week.

Q       And the other days?

A       We would call out - -

Q       And - -

A       - - or my father would bring something over or something for us.

Q       Could you have made dinner those other four days of the week?

A       No, I was too sick.

Q       What other kinds of activities did you do around the house, if any?

A       '97.  What could I do?  Not much of anything.

                    *               *               *

Q       Did you do anything outside in the yard as far as yard work?

A       No, I can't do yard work.

Q       Why is that?

A       Because yard work is push, pull, squat, bend, uh-uh.

                    *               *               *

Q       - - did you have any difficulty sitting?

A       Yes, always do.  I have a doughnut in my car and home, not here.

Q       A doughnut?

A       Um-hum.

Q       To sit on?

A       Um-hum.

Q       Okay.

A       It just has a piece out of the back.

Q       Okay.  Did you have it then?

A       Have it?

Q       The doughnut during this time frame?

A       Yes.

Q      And how often would you use it?

A      Well, I still use it to this date today.

Q      I mean how often on a typical day would you use it?

A      Well, whenever I'm sitting any length of time, if I'm in a car or you know, at my chair at home, it's there.

Q      Is standing better than sitting?

A      No, I squat.

Q      You squat?

A      Yes.

Q      Can you explain to me why you do that?

A      Out of weakness.

Q      Weakness where?

A      Just total body weakness.

Q      And this is during the time frame of '97 to '99 that we've referred to earlier?

A      Yes, I squat.

*        *        *

Q      How - - let's go in a typical day between the hours of 8:00 and 5:00.

A      Okay.

Q      How much of the day would you be sitting?

A      Between 8:00 and 5:00.

Q      Um-hum.

A      - - how many hours of the day would I be sitting?

Q        Sitting in a chair, correct, not in a recliner or just a regular chair.

A        To eat my meals.

Q        And that would be it?

A        Yes.

Q        Could you have sat longer?

A        Yeah, I probably could have sat an extra 20 minutes, half hour longer.

Q        Okay.  So, we're talking about how many - - how much time total during that time from an eight-hour time frame could you sit?

A        On a typical eight-hour day?

Q        Um-hum.

A        I don't know.  I mean two hours - -

Q        Okay.

A        - - three hours.

Q        How about standing?

A        Standing - -

Q        Um-hum.  - - walking, a combination of the two?

A        No, I can't walk hardly at all.

Q        Okay.

A        No, any walking distance, just walk around the block, I'm a wreck.

Q        Okay.

A        No, I can't walk.  So - - you know, distance because of my chest.

Q        Okay.

A How long could I - - what did you say?  Could I stand?

Q Stand for during an eight-hour time period.

A How long could I stand for during an eight-hour time period?  Stand straight up?

Q Um-hum.

A I don't know, an hour or two.  That would be stretching it, if I could squat while I'm standing.

Q And then the rest of the time you would be lying down, I think?

A Yeah, in a recliner lying down, yeah.

Q And that's pretty much the most that you could have done during this time frame?

A That's what I was doing.

*   *   *

[EXAMINATION OF JENNIFER MITCHELL BY CLAIMANT'S ATTORNEY]

Q Please state your name for the record?

A Jennifer Mitchell

Q Okay.  And do you have a relationship with Mary Michelle Mitchell?

A She is my mother.

Q Okay.  And do you live with your mother?

A Yes.

Q Did you live with your mother during the time frame of April – June 4, 1997 through April 26, 1999?

A Yes.

*   *   *

Q        Okay.  Can you give me an understanding of your relationship with your mother during this time frame?

A        It was really difficult to be close with her because of everything she was going through.  I mean when I would go to school, she would either be in bed or on the couch.  And when I'd come home, she would be there, too.  And she was just - - she was always crying.  She was always really depressed because she couldn't do anything without becoming very ill.  And she would end up on the couch.  So, it was hard to talk to her.

Q        Did you ever see good days where she wasn't on the couch?

A        At that time, not many.

Q        Okay.  Were you involved in any kind of extracurricular activities?

A        Yes, I played basketball and softball.

Q        Okay.  Would your mom go to any of your basketball or softball games?

A        Very rarely because she said the bleachers hurt her.  It hurt her to sit on the bleachers.

*                    *                    *

Q        Was your mom any different back then?

A        She - - no, she was - -

Q        Before her sled-riding accident?

A        No.  yes, she went to all my games.

*                    *                    *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

ALJ      Now, we have agreed that the past work history, prior work history was covered

56

in the last hearing.  So, I'm simply going to ask you to assume a hypothetical individual of the Claimant's age, educational background, and work history, who would be able to perform a range of sedentary work, would require a sit/stand option, could perform - - should do walking on - - any walking involved in a job on level surfaces, could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds.  Should have no over - - should do no overhead lifting or reaching with the non-dominant left upper extremity, should not be exposed to temperature extremes, should work in a low stress environment with no production line type of pace of independent decision making responsibilities, should - - would be limited to unskilled work involving routine and repetitive instructions and unskilled work involving routine and repetitive instructions and tasks and should have no more than occasional interaction with others.  Would there be any work in the regional or national economy that such a person could perform?

VE      Yes, Your Honor.  At the sedentary level, that hypothetical individual, I believe, could function as a machine tender, sedentary, 141,000 nationally, 1,400 regionally.  And the region is West Virginia, Eastern Ohio, Western Pennsylvania, and Western Maryland.  Or general office clerk, sedentary, 299,000 nationally, 2,900 regionally.

ALJ     And is anything in your testimony inconsistent with anything contained in the DOT?

VE      I don't believe so, Your Honor.

ALJ     Counselor.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       With respect to either positions, if such an individual were only able to move their

neck 30 degrees to the left and 30 degrees to the right, cannot move their neck up and down, would that affect at any capacity the jobs that you've identified?

A    That would probably interfere with both of those jobs.

Q    Interfere as in preclude or - -

A    It's hard to - - I mean when you say can't - - can never move it more than 30 degrees?

Q    Correct.  And not up and down.

A    Yeah, I think that would preclude it.

Q    With respect to the original hypothetical, if such an individual would be off task more than 25% of the workday as a result of a combination of any problems such as pain or other symptoms that could be reasonably deemed credible based on the Claimant's testimony and the evidence, would that affect the jobs that you've identified?

A    I don't believe that would allow for a competitive work routine.

Q    And would any of the positions that you've identified allow a person to lie down one to two hours during a workday?

A    No.

*            *            *

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearings and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affected her daily life.

• Washed, bathed, dressed, and shaved herself.  (Tr. 140)

- Did laundry and washes dishes.  (Tr. 141)

- Paid bills, managed bank accounts, and ran errands.  (Tr. 141)

- Read magazines, newspapers, and books.  (Tr. 142)

- Watched television and listens to records and tapes.  (Tr. 142)

- Smoked a pack of cigarettes daily for part of the relevant period.  (Tr. 331, 1031)

- Could drive a car without problems (Tr. 501)

- Occasionally prepared evening meals.  (Tr. 1107)


### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Claimant did not individually number her assignments of error.  The Court is mindful that since Plaintiff is proceeding *pro se*, it must read Claimant's arguments in a liberal fashion.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  The Court concludes Claimant has made the following five assignments of error against the ALJ's decision.  Claimant argues the ALJ (1) improperly determined her residual functional capacity (RFC), (2) ignored the opinions of treating physicians, (3) failed to adequately explain the grounds on which he found Claimant's testimony not fully credible, (4) ignored relevant testimony of the Vocational Expert (VE), and (5) failed to consider the combined effects of her various impairments.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends the medical evidence in the record shows Claimant was not disabled during the relevant time period.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.     <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    <u>Discussion</u>

I.

<u>The ALJ's Determination of Claimant's RFC</u>

The Court first examines the ALJ's determination regarding Claimant's RFC.  Claimant contends the ALJ's RFC is contrary to the medical evidence.

The RFC is what Claimant can still do despite her limitations.  20 C.F.R. § 404.1545.  It is an assessment based upon all of the relevant evidence.  <u>Id.</u>  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  <u>Id.</u>  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  <u>Id.</u>  These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps Claimant

from performing particular work activities.  Id.  This assessment is not a decision on whether Claimant is disabled, but is used as a basis for determining the particular types of work she may be able to do despite impairments.  Id.  The ALJ's decision will be upheld as long as it has substantial evidence to support it.  Hays, 907 F.2d at 1456.

The ALJ in this case found Claimant had a RFC allowing her to perform a variety of sedentary work.  (Tr. 1142).  He stated Claimant required the option to sit or stand at will and had the ability to "walk on level surfaces."  Id.  He also found Claimant retained the ability to conduct every postural movement at least occasionally (although she could not climb).  The ALJ limited Claimant by finding she could not lift or reach with her non-dominant arm, could not be around extreme temperatures, had to work in a low stress, unskilled position, and could only occasionally be around co-workers.  Id.

The Court concludes substantial evidence supports the ALJ's RFC.  The ALJ correctly noted Dr. Grennan found Claimant able to sit in a relaxed position with "no overt signs of pain behavior."  (Tr. 317, 1141).  Dr. Grennan also found Claimant had good lower muscle strength.  (Tr. 317, 331).  The ALJ also properly noted that during an examination with Dr. LoDico, Claimant rated her pain level as only 5 of 10.  (Tr. 326, 1141).  Dr. LoDico stated Claimant exhibited no distress while on the examination bed or while moving within the examination room.  (Tr. 327).  Claimant performed a normal forward flexion test under the supervision of Dr. Gerwin.  (Tr. 164).  Dr. Gerwin noted in June 1999 that Claimant had a "full range of motion at the waist."  (Tr. 165).  A physical therapist remarked in July 1998 that Claimant was "doing excellent."  (Tr. 945).

A physical residual functional capacity assessment from the relevant time period found

could either sit or stand for six of eight hours in a work day and was capable of performing all postural movements occasionally. (Tr. 890-91). It also determined Claimant had no manipulative, visual, communicative, or environmental limitations. (Tr. 892-93). A physical residual functional capacity assessment from June 2000 made identical findings, as did another from November 1997, except that the 1997 evaluation limited Claimant from climbing ladders, ropes, or scaffolds. (Tr. 273-75, 879-881).

Regarding Claimant's mental impairments, a psychiatric review technique from June 2000 found Claimant had slight difficulties in social settings and seldom experienced problems in concentration, persistence, and pace. (Tr. 286). Another psychiatric review technique from November 1997 found Claimant's mental impairments caused no restrictions in her daily lifestyle, no difficulties in social settings, and no problems with concentration, persistence and pace. (Tr. 875). Claimant was diagnosed with depression by Dr. Singer in 1994. (Tr. 706). In 1997, Dr. Andrews likewise diagnosed depression, but also noted Claimant exhibited normal social behavior and communication skills. (Tr. 860-61). He found Claimant had normal thought content and concentration. (Tr. 860).

The ALJ's RFC generously accounted for Claimant's impairments. In accord with the physical residual functional capacity assessments, the ALJ limited Claimant to only occasionally conducting postural movements and not climbing. (Tr. 879, 891, 1142). The ALJ limited Claimant from being around extreme temperatures even though both physical residual functional capacity assessments expressly declined to make such a finding. (Tr. 881, 893, 1142). The ALJ limited Claimant to only working in low stress environments and only occasionally being around co-workers even though two psychiatric review techniques failed to require such limitations and

64

Dr. Andrews had determined Claimant had normal social behavior. (Tr. 286, 860, 875, 1142). In short, the ALJ more than adequately accounted for Claimant's impairments and therefore substantial evidence supports his RFC.

## II.

### The Weight the ALJ gave to Claimant's Treating Physicians

Claimant next argues the ALJ gave insufficient weight to the opinions of her treating physicians. Claimant argues the ALJ substituted his own opinion for those of Claimant's physicians.

It is the duty of the ALJ, not the courts, to make findings of fact, and the court will not substitute its judgment for that of the ALJ as long as substantial evidence exists. Hays, 907 F.2d at 1456. While the ALJ must consider a physician's report on the nature and severity of an applicant's impairments, the ultimate legal determination of a claimant's residual functional capacity rests with Commissioner. 20 C.F.R. §§ 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). Nevertheless, the opinion of a treating physician will be given controlling weight if the opinion is (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human

, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

The ALJ specifically discounted the opinions of Dr. Marquart and Dr. Gerwin. Dr. Marquart had given Claimant a prognosis of "poor." (Tr. 929). He also stated Claimant could only sit or stand for thirty minutes at a time. Id. Dr. Gerwin had opined Claimant could not perform sedentary work. (Tr. 1142).[6] The ALJ rejected Dr. Marquart's findings as "not supported by the objective findings" and "based primarily on the claimant's subjective complaints, which are not fully credible." (Tr. 1141). The ALJ gave the same reasons for rejecting Dr. Gerwin's report. (Tr. 1142). The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456.

Substantial evidence supports the ALJ's finding that the opinions of Dr. Marquart and Dr. Gerwin are not credible. Dr. Marquart's finding of severe disabilities is inconsistent with his own statement that Claimant is a malingerer. (Tr. 929). In February 1998, Dr. Marquart wrote that Claimant had a CT scan that was "normal with minimal bulging of the disk at the L5-S1 level which is unchanged from many previous studies." (Tr. 264). He said she "has some bulging of the disk at the L5-S1 level, otherwise there really isn't anything else we have to offer her." Id. These statements significantly undermine Dr. Marquart's credibility. Dr. Gerwin stated his assessment came from "conversations and examinations" rather than actual medical testing. (Tr. 257). This means the opinion did not have medically acceptable clinical and laboratory diagnostic techniques to support it and so was not entitled to significant credit. 20 C.F.R. § 416.972(d)(2).

Claimant also points to the opinions of Doctors Greco, Entress, and Wetzel Saffle. The

_____

[6] The record from Dr. Gerwin containing this information is found at page 254 of the transcript. Since it is largely illegible, the Court references the ALJ's opinion.

ALJ did not make the same specific findings discounting their credibility as he did with Doctors Marquart and Gerwin. Yet the document Claimant points to regarding Dr. Greco is simply a signature on a West Virginia state form. (Tr. 430). Moreover, another record from Dr. Greco indicated she treated Claimant for only mild ailments. An April 17, 2000, document from Dr. Greco indicated Claimant exhibited numerous normal physical signs. (Tr. 312). Dr. Greco only diagnosed Claimant with a "small hiatal hernia with associated gastroesophageal reflux . . . [and a] small duodenal bulb ulcer." Id. The record is devoid of any rationale to explain why Dr. Greco thinks Claimant disabled. Hence, this opinion is also not entitled to significant weight. 20 C.F.R. § 416.972(d)(2). Likewise, while Dr. Entress stated Claimant was disabled in September 2001, there is no evidence of why she holds this opinion. Dr. Entress' statement merely reads that "This is to state that Mechelle is totally disabled at the present time." (Tr. 449). No explanation for this assessment is given. Id. The ALJ correctly discounted this assessment. 20 C.F.R. § 416.972(d)(2). Finally, Dr. Wetzel Saffle completed a state disability form for Claimant in January 2002. (Tr. 472). There is no explanation of why Claimant is disabled. Id. Dr. Wetzel Saffle's assessment is therefore also entitled to little credence.[7] 20 C.F.R. § 416.972(d)(2).

III.

<u>The ALJ's Explanation for not Finding Claimant's Testimony Fully Credible</u>

Claimant next contends that the ALJ failed to adequately explain why he found her testimony less than fully credible. Claimant argues that while the ALJ properly conducted the

---

[7] Even if the assessments of disability by Drs. Entress and Wetzel Saffle were credited, it is doubtful they could be given significant weight. Both doctors stated Claimant was disabled over two years after the relevant period of disability had ended. (Tr. 449, 472). This represents a significant period of time.

first prong of the credibility analysis in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996), he failed to give sufficient explanation for his decision at the second step.

Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  <u>Id.</u> at 594.  The ALJ must "expressly consider" whether a claimant has such an impairment.  <u>Id.</u> at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled.  <u>Id.</u> at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  <u>Id.</u>  As long as the ALJ followed the legal mandates of <u>Craig</u>, his factual determinations will be upheld so long as they have substantial evidence to support them.  <u>Milburn</u>, 138 F.3d at 528.  A decision with substantial evidence adequately explains its reasoning.  <u>Id.</u>  Since Claimant concedes the ALJ properly conducted the first step of the <u>Craig</u> analysis, the Court only examines step two.

The ALJ gave a long list of reasons for finding Claimant's testimony not fully credible, which constitutes substantial evidence to affirm the decision.  <u>Hays</u>, 907 F.2d at 1456.  First, the ALJ found Claimant's activities during the relevant period contradicted her claims of disability. (Tr. 1137).  The ALJ noted Claimant told Dr. Gerwin in July 1998 she was performing aerobic exercise and expanding her activities.  (Tr. 189, 1137).  The ALJ also noted Claimant boxed toys to give away and went to the County fair in July 1998.  (Tr. 188, 1137).  Indeed, Dr. Gerwin stated Claimant "may have overdone it during the weekend" with these activities.  (Tr. 188).

68

The ALJ next noted Claimant attempted to self-diagnose her problems.  (Tr. 1138).  For instance, the ALJ correctly stated Dr. Gerwin reported in June 1999 that Claimant looked at medical literature to determine her condition.  (Tr. 165, 1138).  Dr. Gerwin also found there had been no positive identification regarding the cause of Claimant's pain, as the ALJ noted.  (Tr. 166).[8]  Even aside from the evidence the ALJ considered, significant evidence exists that Claimant attempted to pursue her own course of medical treatment.  Dr. Greco stated Claimant was eager for surgery.  (Tr. 334).  She stated it was "difficult to reassure her that every x-ray abnormality does not mean that she has some serious pain producing problem that surgery is going to fix."  Id.  Likewise, Dr. Marquart stated in May 2000 that Claimant "was under the impression that taking the disk out at the C6/7 level . . . would remove all of her pain."  (Tr. 258).  Yet Dr. Marquart believed Claimant did not need surgery.  Id.

Finally, the ALJ found evidence existed that Claimant magnified the severity of her symptoms.  He noted Dr. Paroda stated that Claimant "kind of dwelled on her pain discomfort throughout the examination."  (Tr. 867, 1138).  The ALJ also found persuasive statements from Dr. Grennan in a March 1999 examination.  (Tr. 316, 1138).  Dr. Grennan reported Claimant stated she experienced improvement in her condition from a steroid injection.  (Tr. 316).  Dr. Grennan further stated Claimant told him "her activities of daily living have been able to increased [sic] to a moderate extent."  Id.  The ALJ reasonably found these statements inconsistent with the disabling symptoms alleged by Claimant.  (Tr. 1138).

The above summarized evidence provides significant support to the ALJ's conclusion that Claimant's testimony was not fully credible.  It easily satisfies the substantial evidence

---

[8] The ALJ stated Dr. Gerwin made this statement in 1998, when in fact it occurred in 1999.  (Tr. 166).

standard.  <u>Hays</u>, 907 F.2d at 1456.

IV.

<u>The ALJ's Consideration of the VE's Testimony</u>

Next, Claimant argues the ALJ erred in discounting certain testimony of the VE. Claimant does not argue the ALJ asked improper hypothetical questions or that the VE testified incorrectly.  Rather, Claimant points out that in response to certain hypothetical questions asked by her lawyer, the VE testified that a person with the limitations in the hypothetical could not perform any work.  Claimant argues the ALJ erred in discounting this testimony.

A VE may be used to aid the ALJ in determining if a claimant is capable of performing his past relevant work, given the RFC the ALJ assigns.  20 C.F.R. § 404.1560(b)(2).  If the Claimant is not capable of performing his past relevant work, the ALJ may ask the VE whether the claimant can perform any other work that exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1560; 404.1566.  Only if a claimant is found incapable of performing any work existing in significant numbers in the national economy is he disabled.  20 C.F.R. §§ 404.1520(a)(4)(v); 404.1560(c).

Questions to a VE are only relevant insofar as they accurately reflect the limitations the ALJ ultimately determines the claimant has.  20 C.F.R. § 1560(b)(2).  Hypothetical questions including limitations greater than the RFC the ALJ assigns should not be considered.  20 C.F.R. § 404.1560(c)(1) (stating that "If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment . . . when we decide if you can adjust to any other work").

It is the duty of the ALJ, not the courts, to make factual findings and "resolve conflicts in

the evidence." Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). As long as substantial evidence supports the ALJ's factual findings, the Court must uphold them, even if it disagrees. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

At the last hearing, Claimant's attorney asked the VE if in addition to the limitations described by the ALJ a person needed to be off work twenty five percent of the workday such a person would still have any work available to him. (Tr. 1517). The VE responded he would not. Id. The ALJ did not accept this testimony "because the hypothetical factors upon which they are based are not supported by the evidence of record." (Tr. 1144). Claimant contends this was error. Since the error alleged concerns the facts of the case, the ALJ's decision will be upheld so long as substantial evidence exists to support it. Hays, 907 F.2d at 1456.

Since the limitations in the hypothetical Claimant's attorney asked included greater limitations than the ALJ's RFC, the ALJ did not need to credit them unless his RFC was itself in error. 20 C.F.R. § 404.1560(c)(1). The Court has already determined above that substantial evidence supports the ALJ's decision regarding Claimant's RFC. The Court need not consider the entire issue again here. Therefore, the ALJ's decision in this regard should be affirmed.

V.

The ALJ's Consideration of the Combined Effects of Claimant's Impairments

Finally, Claimant argues the ALJ gave insufficient consideration to the combined effects of her impairments. The ALJ has a duty to consider the combined effects of a claimant's impairments. 20 C.F.R. § 404.1523; Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989). "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered, 'without regard to whether any such impairment if considered separately' would be

sufficiently severe." Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (citation omitted). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." Id. at 50. The ALJ's findings will be upheld as long as they have substantial evidence to support them. Milburn, 138 F.3d at 528.

The ALJ found Claimant had the severe impairments of "chronic back pain; status post fracture of the sacrum; protruding disc at L5-S1; lumbar and thoracic scoliosis; myofascial pain syndrome; and adjustment disorder with mixed mood of anxiety and depression due to her physical condition." (Tr. 1134). In his February 2005 decision, the ALJ incorporated by reference his medical findings from the April 1999 decision. (Tr. 1138). It is therefore necessary to determine whether the first decision, in combination with the 2005 decision, gave adequate attention to the combined effects of Claimant's impairments.

The Court concludes the ALJ failed to give sufficient attention to the combined effects of Claimant's impairments. When the ALJ summarized the medical evidence in both the 1999 and 2005 decisions, he simply told of certain physicians Claimant had seen and recited the findings they made. (Tr. 545-48, 1138-42). The ALJ's summary of the medical evidence was objective. (Tr. 545-48, 1138-42). The ALJ did not make analyze the medical opinions and make his own findings. (Tr. 545-48, 1138-42). Indeed, the first findings interpreting the medical evidence the ALJ made came when he told the RFC he assigned to Claimant. (Tr. 548, 1142). The ALJ should have assessed how Claimant's impairments affected her daily activities well before this point. Without such analysis, the Court cannot tell how Claimant's impairments combined to affect her lifestyle. Since the record lacks such analysis, the ALJ's findings are not supported by substantial evidence. Hays, 907 F.2d at 1456.

This case presents a situation very similar to that found in Walker, 889 F.2d at 49-50. In that case, the ALJ "discuss[ed] each of claimant's impairments but failed to analyze the cumulative effect the impairments had on the claimant's ability to work. He simply noted the effect or non-effect of each and found that the claimant could perform light and sedentary work." Id. at 49-50. The ALJ's failure to sufficiently analyze the facts led the court to remand the case. Id. at 50. Similarly, in this case the ALJ simply presented the medical opinions of Claimant's doctors and determined her RFC. (Tr. 545-48, 1138-42). He did not analyze the medical opinions for himself. (Tr. 545-48, 1138-42). The ALJ's summary of the medical opinions was extremely comprehensive. (Tr. 545-48, 1138-42). He was unquestionably aware of the relevant facts. Yet knowledge of facts alone is not enough. Walker, 889 F.2d at 49-50. The ALJ must explain how Claimant's impairments affect her life for the Court to conclude substantial evidence exists. Id.

Finally, the Court notes while the ALJ stated Claimant's physicians found a psychological explanation for some of her physical impairments in calling them "somatic," this is not the case. (Tr. 1140). "Somatic" is defined as "1. pertaining to a characteristic of the soma or body. 2. pertaining to the body wall in contrast to the viscera." Dorland's Illustrated Medical Dictionary 1663 (29th ed. 2000). Dr. Pratt-Harrington stated that Claimant suffered from "somatic dysfunction of the cervical, thoracic, lumbar regions, and sacrum." (Tr. 407). The ALJ took this to mean the impairments had at least some psychological causes. (Tr. 1140). Yet as the above definition indicates, this conclusion is erroneous. If the ALJ does not properly understand what Claimant's doctors have diagnosed, he cannot correctly analyze the combined effects of the impairments.

Since the ALJ gave failed to properly analyze the combined effects of Claimant's impairments, the case must be remanded to Commissioner.  The Court again notes the ALJ has exhaustively discussed the medical findings at issue.  Upon remand, the ALJ simply needs to analyze the combined effects the impairments those findings demonstrate had.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so she may consider the combined effects fo Claimant's impairments.

2.       Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the

Northern District of West Virginia.

DATED: January 4, 2007

                                        /s/ James E. Seibert
                                        JAMES E. SEIBERT
                                        UNITED STATES MAGISTRATE JUDGE